Morning, our first case is number 22-9001 Robert Wharton v. Superintendent. Mr. Lev? Good morning, your honors. May it please the court, I'd like to reserve three Bob Wharton's prison records between his two sentencings show significant positive adjustments and good behavior. It shows no incidents of violence, assault, or threatening behavior. It shows positive monthly reports from the PRC, good relationships with his counselor, positive yearly reports from his housing supervisors, that he's meeting his goals, he participates in activities, he advocates for himself appropriately within the prison, he maintains his family relationships. All of that is positive as even the amicus experts recognized in their testimony below. There is of course negative behavior, significant negative behavior. There are the two misconducts from 1989 for possessions of contraband implements of escape where he had the pieces of broken antennae, one of which was fashioned into the shape of a handcuff key, and then there's the escape from City Hall in 1985 when he was still in county custody. I think one thing that's important is to look at what happened to Mr. Wharton after the 1989 misconducts. He was adjudicated on those and given 180 days of disciplinary time. He served his disciplinary time with good behavior and then when he was released from his disciplinary time, for the next three and a half years, he was exemplary. He had in those three and a half years only one minor misconduct that didn't result in any punishment but just warning. It's the kind of behavior that shows the growth and maturation of a young prisoner and remember Mr. Wharton was only 21 when he committed these offenses and was still in his early 20s when he went to state custody. The kind of growth and maturity that Mr. Wharton had in his early 20s and early 30s said that they hoped to see in prisoners. That's what corrections people want to see. People come into prison, they mature, they adjust, they learn to adjust and accept what's happening and they live their lives peacefully and that's what Mr. Wharton did. So the evidence cuts both ways, right? There's positive aspects of it and there's negative aspects of it and cut both ways means that people can either view it all positively or view it negatively. People can find some might say that the positives outweigh the negatives. Others might think that the negatives outweigh the positives. That's what cuts both ways means, right? In any situation, in the court of law or out in the community, if something cuts both ways it means people can see it from different perspectives. We have to decide how much it cuts each way, right? I'm sorry? We have to decide how much it cuts each way. That's the task at hand. I'm sorry, Judge Hartman, I'm not hearing it clearly. I'm sorry. Don't we have to evaluate how much it cuts each way? It's not enough to say that there's some evidence going one way and some evidence going the other way. I think you have to evaluate what what a reasonable, what any reasonable juror could do and what I'm suggesting to hear is because that's the prejudice standard. Is there a reasonable probability that one juror, that only a single juror could have voted positively and voted for life? And so even if you think that that most people would find that the negatives outweigh and that the court feels the negatives outweigh, that doesn't answer the prejudice issue. The prejudice issue is any single juror and when evidence cuts both ways and here you have, for example, qualified experts on both sides viewing the same facts and reaching different conclusions. We have to look at this in light of what was argued to the jury and he didn't have a lot to mitigate here. The bulk of the closing argument is attacking various witnesses and then there was a plea for mercy but the substantive argument that was made twice on two pages of the transcript was he's going to spend the rest of his life in prison. So doesn't that suggest that whatever other positive things there are, the negative here would have torpedoed that and any lawyer in his right mind would not open the door to bringing that in. Well that's certainly not what Mr. Cannon testified to and what he subjectively was thinking, but Strickland is an objective standard. But it's an objective standard based on what counsel says is his strategy at the time. Okay, well if someone overlooks a strategy but a reasonable lawyer would not take that strategy then it's not a range of options and one of the reasonable options not take that strategy then it's not even division performance. I would agree with you, right? Different lawyers could have taken different strategies had they investigated, had they uncovered the evidence and uncovered the records. Some lawyers might have said I'm not going to introduce that and if that were the situation here I would have a very very difficult time arguing to this court that that was an unreasonable decision to make. But other lawyers could say no, I'm introducing family testimony that shows that Mr. Wharton has a history of being a good person, a loving person, that that history has continued after his incarceration. I've maintained his relationships after incarceration. His behavior, particularly his behavior for the last three and a half years before the sentencing as he's matured, that exemplary behavior to me balances out my mitigation and fits in with my mitigation. Okay, well so different lawyers could have different strategies. I think you've now conceded that maybe this isn't division performance because Strickland requires showing that it could not have been tactical. That an objective lawyer, you know, could have chosen to bypass something and it doesn't matter if he was subjectively over overlooking it. His testimony on that is not enough. If you say some reasonable lawyers would have just stayed far away from this saying the cons outweigh the pros. But that's not what the Supreme Court did in the Hinton case. It looked at counsel's law. That's not what this court just did in the Rogers case where it said counsel where counsel is ignorant of the law. That fails to meet an objective standard of reasonableness and you can't say that counsel made reasonable decisions when they're based on ignorance of the law. Plus in Rogers there was no reason not to point the finger at somebody else. Here there's a very good reason not to go down that road. So ignorance of the point of law, fundamental to his case and basic research, you know, that's it that's a general rule. But the question is would a reasonable lawyer have gone... would every reasonable lawyer have gone down this road? And I think as well this court has already given a large part of that answer in its remand opinion. In its remand opinion it said counsel had a duty to obtain the prison records and that if he failed to... if he negligently failed to obtain those records that would be below an objective level of performance. So your point in response to Judge Beavis' question about the performance prong is really it was the failure to investigate and to see what these records might yield as opposed to that maybe more strategic decision that the benefit of those records, and if I understand what you're saying, you're saying that counsel was deprived of the ability, deprived himself of the ability, to make an informed strategic decision later by not doing the investigation in light of Skipper. Is that roughly where you are? That's roughly where I am, that's correct, but I also have the next layer of that that counsel testified that if he had obtained those records he would have used them at the sentencing because he believed that they were consistent with his theory of mitigation and that the positives outweighed the negatives. In terms of... at times in the briefing there's this notion that even putting the positive aspects on would not have opened the door to the negative. It strikes me that it would. It strikes me that if you're going to say, hey, we've got all of this evidence, we're opening the door of prison adjustment, there's very, very, very little evidence, if any, of prison adjustment put into the record in 1992. The jury asked about it, could we consider this? Not sure there was too much at all, and so now we're in a situation of, well, wouldn't it open the door? The answer is we don't know how much it would have opened the door. It certainly would have opened the door, and I have no question that it would have opened the door to the 1989 misconducts that occurred while he was in state custody. No question. They come in, but there are questions about, and Mr. Cannon testified to that at the time of the hearing, about whether the escape would have necessarily come in. What legal principle would divide between county custody and state custody for purposes of a prison adjustment analysis? The vibe is state custody is far more secure. It's geared towards long-term secure incarceration, and in fact, the experts, both the amicus experts said that, Dr. Beard said that there are secure maximum security prisons in Pennsylvania that could safely house Mr. Wharton, and so there's a huge difference. But as far as his adjustment, doesn't that almost cut the other way, in the sense of when it's very, very strict, he follows the rules. When it's a little more lax, he doesn't. That almost suggests that he's not adjusting, it's the rules that are driving the behavior, not his own volition. I think what it shows is that his behavior in state custody showed this growth and maturation over the years. With stricter rules, with stricter rules. And that's what prison is for, that's what prison does. Yes, he was wilder when he was younger, but not now. That's why the prison mitigation evidence is so important, because it shows that it changes behavior, right? That may tip the scales in favor of a life sentence. A minute ago, you said it would open the door, the escape evidence would be allowed to some extent. Can you elaborate on that, to what extent? Well, certainly the two misconducts in 1989 would have been admissible, because they're serious misconducts, they're significant evidence of misbehavior. So there's no doubt in your mind that would have been part of the evidentiary proffer? That would have been part of the evidentiary process. That's the opposite of what the DA's arguing. Are you familiar with the DA's briefing in this case, or the companion case? I'm familiar with it, yes, sir. So the argument there seems to be that, well, the escape evidence, including the escape at the county, was of no moment. And we know that because the District Attorney's Office didn't bring any of that evidence in. What's your view of that? No, and I agree with that, and I'm distinguishing... Well, if it's of no moment, then it's not coming in, and you're saying it's coming in. Which is it? I'm distinguishing between the two misconducts in 1989, while in state custody, and the escape... Well, the DA's office didn't bring in the state custody misconducts either. And the escape in 1985 from City Hall. All right, but the misconducts while Mr. Wharton was in the administrative custody or the restrictive housing unit, those weren't put into evidence either by the DA's office back in 1992. No, they were in the records that were presented to the district court and to this court the first time around. So in the remand opinion... But was it argued to the jury in the 1992 sentencing? No. Well then, so it was of no moment then. Or was it not admissible because the door was not open? No, and I hope I'm following you, Judge Hardiman. What we're saying is if counsel had presented... So in 1992, counsel didn't have these records and didn't present any evidence of positive adjustment. So what we're looking at is what would have happened if he had the records, right? To determine prejudice, we have to look at all the evidence that has been presented on both sides. So if he had the records, he presented the evidence, Mr. Wharton's non-violent and good adjustment and positive reports. What if the DA's office had the record? Would the DA's office have just offensively put in that evidence without the door being opened? In 1992? I don't believe they could have put it in without the defense counsel putting in evidence of positive. But maybe they could have because... It's an interesting question because the defense did present testimony from one of Mr. Wharton's family members about her relationship with him that began after his arrest and incarceration. So maybe it would have been relevant. It could have been argued that it was relevant to rebut that testimony. They certainly didn't do that or try to do that in 1992. And they certainly didn't try to put the escape in in 1992. Well the escape would have been heavily prejudicial if the door hadn't been open, right? Especially considering that he was escaping while in court on a different conviction for an unrelated crime. It might have been, but it also might have been relevant to an aggravating circumstance of a prior significant history of criminal behavior involving violence or the threat of violence. They chose not to do that. And they didn't even try. They certainly could have asked the judge for permission and the judge would have had to make a ruling. They didn't even try. And more than that, so I think I agree with my friend at the District Attorney's Office that for these purposes today, when we're weighing how a single juror might have reacted to the positive and the negative evidence here, that the escape, the heavy reliance the District Court puts on the escape is diminished by the fact that the District Attorney's Office, for the years of litigating this, when they argued in this court, their head note of their brief in this court in the prior appeal was, counsel was not ineffective because the positive evidence would have opened the door to negative evidence. And they did not argue that the escape was part of that negative evidence that would have opened the door. So there's a real question here about how relevant the escape is and about what role it would have played. And again, we have to look at this from the one juror standard. So in order to reject... Let's imagine you're right, I'm skeptical. Let's imagine you're right that this is deficient performance. Let's imagine that the escape stays out. But you want to say, well, he had good performance in prison except you agree that the keys would come in. And that's kind of like saying he had all A's on his report card except if we ignore the F's. You've got a feather on one side of the scale, you got a brick on the other side of the scale. And so what makes you think that there's a reasonable probability that one juror would have voted for life in light of that? Because I think the evidence could be viewed different ways by different jurors. One juror might find that those misconducts are so heavy they negate everything else. But another juror might say, yes, but it was only for a one-week period within a six and a half year incarceration that he committed this. And after that, his behavior was good. And before that, he didn't have any violence. And he never used the objects that he was found to have had in any way as an escape, as an assault. No attempt to use those objects at all. If I could make that argument, that would open the door because the escape in City Hall involved his unfastening his handcuffs, correct? That would be really dangerous to allow that in. The fact that he never used those would open the door to the City Hall escape. Maybe, maybe if that was raised, the judge could rule that way. But a judge could just as easily say the City Hall escape does not rebut the evidence that he didn't use those. And it was agreed. Everybody agrees he didn't use those objects. Because the argument requires more, that he's not really a danger of using them. And the City Hall escape shows he's certainly a danger. And that even if the door were not otherwise open, it get opened by that. Now, jurors could find that those objects show a potential for danger. Other jurors could find that even though there's a potential for danger, there's, there's positive aspects that he didn't use it. And then they could weigh that along with the other positive aspects of how his behavior changed after he was caught, and he was punished, and he did his punishment, and then he came out again. And, and so a reasonable juror could look at the way that his behavior changed and say, say, I can find, along with, as the defense experts would testify, that this is a man whose behavior changed, who can live safely and for that reason, I could vote for life. And I think that's particularly valid in this case, when you look at the struggle the jury had without that evidence in reaching a verdict. The struggle was after three hours, they came back and said they were deadlocked. Well, well, it was, it was more than that. It was after one full day of deliberation. And they sent a note out to the judge. And then they got a standard outline. About that they were deadlocked. They had also asked some questions about the mitigation. They were obviously thinking about the case. They asked questions about whether mitigation could be, had it be before the crime, at the time of the crime, or after the crime. And I think the next day they deliberated most of that day, for five or six hours that day, until three o'clock. And not only do you have the deadlock note, but they rejected two of the four aggravating circumstances that the Commonwealth had put forward. And they are the two most heinous aggravating circumstances. That he created a grave risk to another person, baby Lisa, and that the murder was committed with torture. Mr. Lev, let me, let me ask sort of a basic question. Isn't it true that the most compelling argument in the penalty phase of a capital case for a Pennsylvania crime is spare this man's life because you can rest assured he's going to spend the rest of his days in prison? That's the most compelling argument. I don't know that that is. There are, at least, at least in some cases, in some cases it is. But life means life in Pennsylvania, right? It does. And that is, is that not significant when compared to a different time when jurors might think that if they're giving someone a life sentence, that might mean they would actually do 20 years in state custody? That's true. But Pennsylvania courts have also allowed judges to give instructions that, that even though life is non-parolable, it is subject to commutation and that there is a possibility that in the future, a judge following the, a governor following the proper procedures could commute a sentence. And that's right. And we know that's rare. So if life means, if life means life, why, why would an effective defense lawyer put before the jury insistent efforts, persistent efforts by the defendant to escape? It seems like a really, that seems like an ineffective strategy, doesn't it? And as I said before, it's a question of balance that different people can see different ways. And so some, some lawyers might go that way and that would be a strategic decision that would be subject to deference. But other lawyers might decide, yes, this, this is bad, but there are differences between the city hall escape and the possibility of escape from a maximum security prison. And that the city hall escape was long. Do you think, do you think we should say that the jury would find solace in the notion that although Mr. Wharton will continue to try to escape, don't worry, he's in administrative custody, he will fail. That, that's the argument? That the jury could find solace in the conclusion that the experts say he could be safely housed in a state maximum security facility where his risk of escape would be extremely minimal and that his behavior since he's been incarcerated shows, and particularly since 1989, shows a growth and a progression to adjustment to prison and a willingness to abide by the laws. It's a willingness to abide that we've seen for the last 30 years, that, that growth and maturation. Do we consider the last 30 years or do we have to stop at in 1992? Well, I think that's not an easy question. And I understand that, that the jury, in terms of thinking of prejudice, we have to look at what could have been done in 1992. But, but in terms of looking at the credibility of the Commonwealth experts who testified that, that from the facts they draw an inference of negative adjustment, we have to look at that credibility and say that those opinions turned out to be wrong. And so what, so if Mr. Wharton tried to escape in 1980, 98, 99, 2005, you would say that that's fair game. That could be considered. I think you'd be arguing that we have to, we have to look at 1992. I might, but I also think that the other side, if Mr. Wharton had tried to escape in 2005, I think amicus would have been arguing that. Oh, they, they might, they might've tried to argue it, but that doesn't mean, that doesn't mean we should consider it, right? That, that, that's correct. But I think it goes to the credibility. It goes to how, how any single juror might have viewed the expert testimony. The, a single juror could have looked at the competing experts, all of whom were very well qualified, and said, I think that the amicus expert is putting too much weight on what happened seven years ago and not enough weight on what's happened for the last three and a half years. And so I'm more persuaded by the defense experts. So there's nothing in the record to suggest in order to defeat a claim of that every juror would necessarily have viewed the negative aspects more than the positive aspects. Every juror, and you would have to find that with some certainty, because my burden is only to a reasonable probability. And there's nothing in the record that provides that kind of certainty. There's nothing that's so overwhelming about the negative aspects of the behavior in light of its positive aspects. That's so overwhelming. What about the awfulness of this crime, this campaign of terror against a family? Grizzly facts, to be sure. Again, they were not facts that led the jury to be so concerned that the death penalty was an easy decision for them to make. And they rejected the elements of torture that could have involved mental anguish as well as physical anguish. And even the first jury in this case, although the first jury sentenced Mr. Wharton to death, they sentenced his equally responsible co-defendant to life. His co-defendant didn't force the woman's head down into a pool of water. I'm sorry? His co-defendant's killing was different from his killing. I'm not so sure that that's correct. I think they both were involved in the prior burglaries. They both were involved in the campaign of terror. One killed one. Equally bad strangulation involved. Did your client orchestrate this because he's the one who had the grievance against this family? I'm sorry? Your client is the one who had the grievance against this family for non-payment. He's the one who orchestrated all of this. And I think the record supports this, but I can't say for sure. I think the co-defendant was also part of the crew that had done work that was grieved by the failure to pay. I thought there was evidence in the record that co-defendants, they couldn't go through with it, and that he pointed the finger at Wharton for the second killing. In the killing of- The co-defendant said that, but the jury convicted him of first degree murder, so the jury obviously didn't accept that. So if we want to talk about aggravating factors, if the jury would have found four aggravating factors instead of two, your kind of mixed bag prison adjustment evidence wouldn't be nearly as persuasive, right? I think it would have shown that the jury did not struggle with this evidence before. I don't know if it would have been more persuasive. It might have been even more persuasive because it was more necessary to show the kind of change in his behavior. And that his behavior had changed since the time. All right, Mr. Levy, we reserve time for rebuttal. We'll hear you then. Thank you so much, Aaron. Thank you. Mr. George, on behalf of the superintendent. Good morning. If it pleases the court, Paul George. I refer this court initially to its own prior decision in this case, which I think makes three important points that were certainly important to the commonwealth in reaching the position that it takes today. First, it was a virtual certainty that an untrained, underfunded, and unsupported solo practitioner who was handling his only death penalty case did not conduct the kind of investigation that this court noted in its initial warden opinion was an important aspect of preparation. And that's the prison records. You're saying he was plainly ineffective under Skipper for not looking at the prison records. For being unaware that Skipper even permitted the kind of evidence that you could potentially secure by looking at the prison records. And so at that point, all of this court's prior questions about whether or not it was deficient performance were answered by the evidentiary hearing when the gentleman testified himself that he wasn't aware that this was even an option. The other thing that this court said in its initial opinion was that there was a prima facie case made out of materiality in this case. And finally, that this court itself looked at the prison records, assessed what they saw in there, and made its own determination. That they indicate that Wharton was adjusting well to prison life, and that his behavior was generally satisfactory. Okay, so maybe our prior opinion says there's deficient performance here. This evidence could be material, but we specifically remanded to look into the anti-mitigation evidence too. Our court remanded, it didn't render judgment. And so, yes, that's a good starting point, but it's only the starting point of the analysis. I agree that it's only the starting point. But for the Commonwealth, at least, we do look at the 30 ensuing years. We do look to see what expert made a prediction that was borne out by reality. I agree with counsel from before, the law is very murky. We supposed to theoretically take ourselves back to 1992 and listen to expert's testimony and- For purposes of prejudice, we have to, don't we? I agree- It seems obvious. But is it really, what sense does it make to affirm a real world death penalty based on the fact a theoretical jury would have done in 1992 if they were persuaded by experts whose testimony turned out to be inaccurate? Because the law requires us to do a counterfactual hypothetical at a particular point in time. It's not ours to choose that. And I agree with counsel's previous point, however, that in assessing the credibility or the persuasiveness of the experts, we must recall that equally qualified experts looked at the records and made conclusions that were different from the amicus' experts. I find it curious that the amicus' experts were apparently uninterested in whether or not their predictions were going to be accurate, because they appeared to be surprised during the hearing to learn that Wharton had 30 years of unremarkable behavior. They appeared to have never even asked amicus' that retained them, was our prediction right? If we testified in 1992 that this guy was gonna continue to be a big problem in the district, it turned out that they hadn't seen his records afterward and hadn't asked to see them. And I can't help but feel that that's a remarkable aspect of their testimony. We can't assess with certainty how a 1992 jury would have treated what. All right, you're laying blame at amicus for not looking at documents of recent vintage. But what about your office's failure to investigate the most basic of documents prior to that were existent from prior to 1992, which are clearly relevant? In which documents in particular? A criminal records search? All that I can say in response to that is, I disagree with counsel. First of all, in one respect, I think when you put on evidence that your client is a good guy, there would have been nothing to prevent the commonwealth from introducing evidence to say he's not such a good guy. Look, he tried to escape. I think that evidence would have been admissible back then. For some reason, the commonwealth elected not to introduce it. Then, in the ensuing decades of litigation, where the commonwealth vigorously supported the death penalty. In none of their briefing was it ever mentioned that this escape occurred. After the remand from our court, when you were on notice that you had to consider mitigation evidence, the prison records, the good behavior, and anti-mitigation evidence, it would stand to reason that you would advise the district court that the anti-mitigation evidence, which looms large, including the escape attempt, and the escape tools misconducts in the prison, that you would have proffered those directly for the district court to look at and evaluate. That didn't happen. I agree, because if you read every single document that was ever submitted to this court or any other court- It's not every single document. You were well aware of all of the Program Review Committee reports about good adjustment, correct? Yes. Right within those documents, right within them, and you can go through them if you'd like, is the evidence of the severe misconducts for possessing the antennae in the cell. They're mentioned right in the Program Review Committee reports. Nobody ever attempted to deny the existence of that. I thought you were referring to, why didn't you tell the court about the escape attempt? Why didn't you tell the court about all of it? It seems passing strange that your presentation to the court was heavily focused on one side. And that, in and of itself, is not passing strange. That's why we have an adversary system. People tend to present their case in the best light favorable to them. What's passing strange is you presented the case in the light most favorable to your adversary, which is how we ended up with amicus being appointed in this case. What am I missing about that? Well, one thing that we were certainly informed by this court's own opinion, which pointed out the deficient performance, the prima facie case of materiality, and the fact that on balance, the prison of adjustment records appeared to be positive. That certainly affected us. On the other hand, we also took a look at what did the individual's behavior turn out to be in the ensuing 30 years? And someone else will have to make that argument that on the basis of experts' predictions of future- But again, in terms of, I know we're gonna argue this in the next case, but in terms of candor to the tribunal, perhaps we wouldn't have the second case had you gone into the district court and said, judge, there's a lot of evidence to show that this fellow's adjustment in prison was not all good. There were some severe problems, but we think as a policy matter, it's really important not to affirm a death sentence for 25 or 30 years of good behavior in prison. Now, that could be a really credible policy argument. Agreed. It's quite inconsistent with the law, consistent with what Judge Bibas said about what we are required to do, namely to turn back the clock to 1992 and do this counterfactual evaluation. Agreed, sir, but the lower court never asked us for that. We notified the lower court of our concession in the manner that had been done on many occasions, both before and after the present district attorney took office. And at no point in time, prior to the hearing itself, was an explanation for the change in our position requested. Now, those other concessions of relief, pardon me, sir. Those other concessions of relief which were presented to different district courts in exactly the same manner had never prompted the same- Well, I think that might explain what happened here. I mean, if the district court here in this building was rubber stamping concessions made by your office, then I guess it would make sense that you would rely on that continuing to happen. But I don't know what we're to make of that. I mean, are we supposed to reevaluate all of the other cases where your office conceded positions and the district court adopted them without inquiry? Well, if you were to do that, you'd have to go back many, many years. I mean, there are at least 28 cases that I've identified where there were concessions of death penalty relief at common police court level in Philadelphia County before the present administration ever took office. So concessions of relief are nothing new with respect to Philadelphia death penalty. Well, but those are the cases in chief. Those aren't on habeas, right? Those are cases that are in collateral review. There are cases that were PCRA petitions were brought in the common police court and where prior administrations did exactly what we did here, conceded relief and- But if the common police judge on collateral review accepted the concession, that's just not a matter for the federal courts. It's not necessarily a matter for the federal court. We've got enough on our plate that we need to stay focused on what's of concern to the federal courts and this court in particular. Yes, sir. Such concessions, as we pointed out in the court below, were routinely made before, and they weren't just made by the present administration. I'd like to turn our attention back to the facts of this case for a moment, if I could, and just point out that, you know, the whole proposition that's been made by the amicus and by the court below, that it's a negligible import, how long the jury deliberated here and how they, at one point, notified the trial court that they were deadlocked, is significant. And I'm quite sure if it was the other way, that if a unanimous jury had come back in five minutes and said, we want death, that I'm not so sure they would be taking that same position. And my only point there is simple. It seems like such common sense to say, really terrible underlying facts automatically means death penalty for every rational, non-idiosyncratic juror. But experience tells us the contrary. It's not that easy, but it's not just that. I mean, I agree with you. You can't just jump from the hands of the crime, maybe incline things one way, but you have the fact that, you know, the escape attempts and the escape paraphernalia just, they're objectively a lot worse than taking some GED classes and not getting into trouble for a while. I mean, maybe it's not quite a brick on one side of the scale and feather on the other, but maybe it's a dozen feathers against a brick. It's still kind of hard to see those balancing out in a reasonable juror's mind. Well, that's one person's assessment, and I think it's what people think will be the common sense assessment. Again, this looks bad, so every juror would have to look at it in light of the closing argument where future dangerousness was the one significant argument. If we set aside a general plea for mercy and a tax on the witnesses, the argument really was future dangerousness. It wasn't, you know, impoverished upbringing or mental deficiencies or any of those other things, but there were twice references to he's going to spend the rest of his life in jail, so we have to look at that in that context. I agree that you must look at it in that context, but I don't agree that the stone and feather analogy. I think for one juror, that might very well be 100% accurate, but experience teaches us that jurors, notwithstanding their death qualification, will at times fasten onto positive aspects of the defendant's character and find that they have more weight. What could be more grim, you would ask, than the facts in this case? If we're going to kind of get into the juror's mind, you're asking us to do it based on what the new evidence would be, and if the door's open to escape and making keys, maybe the closest juror, the juror that was the longest holdout, hypothetically, at the 1992, if that new evidence came in, maybe the escape, maybe the making the keys, would have moved that juror far away from being the closest juror and would have made this a very easy case for that juror. We have to, at a minimum, account for the fact that the closest juror with the new evidence might not still be the closest juror anymore. Well, first of all, we don't know now how many close jurors there were. That's fine. If this is the case where somebody came out, the foreman told the judge, we got a juror back here who's refusing to deliberate, they'd only send a note back that said they were deadlocked. But I agree with you that perhaps most of the jurors would have assessed it just like that. But maybe there was another juror who said, based on those qualified experts, as it turns out, accurate predictions that the guy is going to adjust, that's enough, that's all I need. But what that tells me, though, what that tells me, though, is that our data set, I think in a light favorable to you, is that the jury was, this was a close call for the jury. We don't know that that's not a given anymore because we'd have to look at the escape attempts and the making of the handcuffs. And so when that new evidence comes in, we can't really say, gee, it was a close call. It was a close call on that record. But at one level, if we want to make a new record, we don't know anymore that it's a close call. And so we don't know. I certainly agree with that. But when you assess the impact of that additional evidence that the jury didn't hear from me, you must also factor into it that they didn't hear from the experts that the defense presented, the experts who said, it turns out accurately, as this guy gets older, he's going to calm down and he won't be a problem. All right, but at the time you made your concession, you didn't know about the escape, right? That's correct. All right, so you had, at least arguably, at the time you made the concession, you had much firmer grounds for making the concession than you do now, based on what we know now. Would you at least admit that? Well, I cannot totally agree with it, sir, because of what I just said to his honor. That seems to disregard all of the probative value of the escape evidence. I don't ask you to discard the probative effect of it, or its probable impact on most of the jurors. But remember what we're talking about here is a reasonable probability that one juror might have found the defense experts persuasive and adhered to the opinion that life was the appropriate sentence, based on the prediction that the guy was going to, like, calm down and quit being such, you know, a menace to society. And, you know... Mr. George, what are we to make of some of the statements, the pages at the end of your brief, about what you argue to be the unfairness and inappropriateness and outlandish expense associated with the death penalty? Well, all I did was quote the attorney general when I said that. What I was saying there is that our decision here was necessarily informed by what we learned by evaluating the death penalty cases, and there's no... It sounded like a strong statement that you were making that this case isn't about whether Mr. Wharton had a good argument under Section 2544, but, rather, there's never a good argument. It just seemed to be a broadside against the system, and, again, that... Accepting, for your benefit, that everything you said there is persuasive, I'm not sure that that helps us or it helps support the notion that your office took a hard look based on the extant law as to whether Mr. Wharton had a good habeas case. You understand my point? I understand the question, but I think our point actually was that the deficiencies that are apparent here were symptomatic of what happened in that era in Philadelphia County with the death penalty, where you consistently had exactly what you had here, an underfunded, unsupported, untrained person handling a death penalty case of significant impact entirely on their own, and it's just pointing out that it's a... And habeas should be... Habeas relief should be granted in all such cases. No. We looked at the facts here in this case, and we... As I say, I can't help but underline the fact that it informed the stance we took that the guy has not been the ongoing menace over the ensuing decades that the experts from the amicus were so ready to predict that he would be. And... You can keep going. Well, I don't have anything in addition to add here. I stand ready to answer any questions that this court may still have for me. I think we're out of questions. Thank you, Mr. Joyce. Thank you for your attention. Appreciate it. We'll hear from counsel for amicus, Ms. Mahler. I'm sorry to do this to you, Ms. Mahler, but could you start where I sort of left off with Mr. George? He cited, he quoted then Attorney General, now Governor of the Conwell, some statements made about the death penalty, et cetera. Can you address those comments in their brief and what salience they have to this case, if any? Absolutely, Your Honor. Good morning. I'm Keri Mahler on behalf of the Office of Attorney General the amicus carry in this case. Your Honor, to simply answer your question, I would say they have zero relevance in terms of this case and the claim before the court in terms of whether counsel was ineffective for failing to present so-called positive prison adjustment evidence during the relevant time period. I think if anything, Judge Hardiman, as you sort of alluded to, it seems to show more of a broad scale sense of an ideological overview of death penalty cases in general and not this course in particular. So maybe just to tease that out, if a district attorney's office could give a notice of concession in a habeas case based on its broad views of the death penalty and its application, untethered to facts or law, how is that different than a governor's function, a function usually reserved just for the governor for commutation? Is the DA now kind of, is the DA that would do that kind of taking power that would otherwise be reserved to the governor through a notice of concession in a habeas case? I would say it's similar. It's a similar analogy, but I don't think that any of that has to do with the current issue before the court in terms of whether counsel was ineffective. Okay, good. So ineffectiveness, we've got the two prongs of Strickland. Let's talk just briefly about prong one first. So, you know, Mr. George argues with some force that our prior decision in this case is least law of the case and therefore that's deficient performance. And on top of that, you know, he might've added that the Supreme Court generally will unwilling to second guess, but in failure to investigate in death penalty cases, we have Wiggins, we have Williams, we have Rompillo where the court says, you gotta at least find out what's there before you make a tactical decision about whether to introduce it or not. So what do you say about those? Is it something that you concede or are not contesting or is there a basis to question whether there was sufficient performance in the first place? Yes, first of all, as your honor recognized earlier, the 2018 remand opinion was remanded specifically for a hearing because the third circuit recognized that it needed a complete developed record of anti-mitigation. So clearly the court at that time did not have all the information in terms of what counsel did or did not do in this case in the impact of that, mainly if there was significant anti-mitigation evidence. So counsel cannot be ineffective for failing to investigate unless counsel has an objective reason to believe that they're gonna find information helpful to the client. Strickland says that. So in this case, I think we have to first look under an objective standard as your honor recognized earlier, what counsel knew at the time prior to the 1992 penalty phase hearing. Counsel testified that he knew of war and violent premeditated escape from city hall. Under those circumstances, counsel had represented the defendant for about 10 years from 1984 to 1993. He knew his client well. He was actively working on this case at the time of the 1986 escape attempt. He was well aware of it. Looking at that under an objective, reasonable standard, what reasonable attorney would think it's a good idea to look into their client's prison adjustment knowing that he had a violent premeditated escape attempt from city hall. Instead, counsel, while preparing for a penalty phase, is gonna use their limited time and their limited resources to focus on investigations that are gonna be fruitful to their client and helpful to their client. They're not gonna go down this road of prison adjustment knowing that their client had the worst possible prison adjustment evidence out there, a violent escape from custody. Well, why wouldn't he look into state prison adjustment and then try to make a legal argument potentially? Not saying he would ultimately settle on this, but at least potentially he would look at the state prison adjustment and then consider proffering that to the sentencing jury while filing a motion in limine to exclude the 86 escape attempt as unduly prejudicial because it was in county and it was in relation to a separate crime. At least theoretically, he might have, a good lawyer might have considered those things, right? He might have considered it, your honor, but it certainly would not have been successful. If the claim is that his client had positive prison adjustment, then you're looking at the client's behavior and conduct while in custody. Therefore- Well, but state custody is different than county custody, right? I mean, especially he was consistently, was he not in, because he was on death row. He was in either AC Administrative Custody or the RHU. Was he not? Correct, your honor, yes he was. And isn't it true that that's a more secure environment that someone is a lot less likely to even have the opportunity to cause trouble in the prison, much less escape? That's correct, your honor. And the fact that this inmate, Mr. Wharton, had six misconducts during that seven-year time period, and that's something that former Secretary of Corrections, Jeffrey Deer noted, is that this was an inmate who didn't just have those two serious misconducts for possession of contraband, implements of escape, but also all the way from the beginning, all the way to 1992, had consistent misconduct. Well, I don't think petitioning and taking a survey in the jail was gonna cause the jury to look negatively upon him, right? I mean, it was conceded, was it not, that the other four misconducts were minor? Yeah, that's correct, your honor. The other four were minor, but that is something that Jeffrey Deer testified to, that this wasn't just an inmate who started and took a year or a short period of time to adjust and then had perfect prison adjustment. But still, even without the escape, even if we take that out, we still have two very serious misconducts of possession of contraband, implements of escape, one of which was fashioned into the shape of a handcuff key. But I think the fact remains, the fact we have is we have the escape from City Hall, and then we have just three years later, we have those two very serious misconducts, and the common theme between the two of them, which is the handcuff key. When Warren was brought down for sentencing in his unrelated home invasion robbery case, he apologized for the crimes that he committed, said, I'm gonna use the time in custody to better myself, all the while he's hiding a handcuff key. He then pushes a deputy sheriff, runs down the public hallway in City Hall, runs down the general public staircase in City Hall, and has to be shot twice to be apprehended. The handcuff key was found at the elevator where he effectuated his escape, and that he used to uncuff himself. Then we have just three years later, while he's demonstrating superficial positive prison behavior, being polite, being cordial, playing chess, writing poetry, these unremarkable tidbits of so-called positive prison adjustment, while he's hiding these possession of implements of escape, a makeshift handcuff key, it's the combination of the two that need to get seen together, that show a theme here. But all that goes to prejudice. That doesn't help you with deficient performance. I think it goes to both, it goes to both, your honor, because if you're looking at- Isn't the law, I mean, the law seems really clear that failure to investigate is gonna be deficient performance. Well, it's not gonna be deficient, your honor, unless there's some, it's not gonna be deficient if there's evidence that's harmful or that's fruitless to your client, and that's strickland, that you can't be, counsel can't be- But how can you know, you can't know whether it's harmful until you investigate? Well, if you have reason to know, if you have reason to know it's harmful, and in this case, counsel- So your argument is very targeted to the escape. Your argument, as I understand it, is that because this lawyer knew about the escape, then any good lawyer would have put the blinders on and not wanted to go down the road of prison adjustment. That's your argument? Any objective, reasonable lawyer is not gonna spend their limited time going down that road thinking- Well, there wasn't a time issue here. I mean, there wasn't a lot of, I mean, the mitigation was standard, loved ones and family, that people cared about him, and I mean, they were the pleas for mercy that we see all the time in death penalty cases, wasn't it? Yes, Your Honor, it was family members testifying- So it wasn't like he had a resource application issue where he was spending all kinds of time investigating other things. I mean, he interviewed the family members and the family members testified to positive attributes. And his mother testified that his life should be spared because he's never gonna get out of custody. Right. But obviously- So your argument is that because Mr. Cannon knew that he did want, at least once tried to get out of custody, that he just should have avoided anything having to do with prison adjustment. Yes, I think that gives him an objective, reasonable basis for not going down that road. And then in terms of presenting it, the objective standard would say that counsel was reasonable for not opening the door to the escape. Okay, but that's what I'm challenging on. Opening the door is a second order issue. You can't know whether you're opening the door until you gather the information. I'm pressing you on the point that he should have at least gathered the information, then perhaps made a strategic decision not to proffer the information because it would open the door and would do more harm than good. And then upon looking at the information, counsel would see that opening the door would lead to catastrophic consequences for his client when he's trying to argue that his life should be spared. So, I mean, at one level, if we're in the mind of the defense attorney, the attorney knows there's an escape. And then they're thinking to themselves, thinking to themselves, what could I possibly learn by way of prison adjustment? What would be the best, if I did the greatest investigation ever, what would be the absolute best prison adjustment evidence I could come up with? And I'm not sure what exactly that would look like, but what you're saying is when he's doing that thought experiment, almost nothing in your view would eclipse this, if he got a GED, if he attended religious services every day, if he kept a diary demonstrating a clear conversion, pick the best possible stuff he could ever have. You're saying is it was still reasonable for counsel to say that, that can't eclipse the escape attempt. And therefore I'm not even gonna look for that. In the off chance that I had the best case scenario. Based on the escape, yes. I think if you would take the escape out of it, it's a much, much different conversation. And we just have the implements of escape misconduct. It's a different analysis. What do we do with the DA's failure to use this escape through all these years? Your friends on the other side make a big deal out of it. Is that relevant? No, your honor, it's not relevant. And I certainly am happy to address that. Let's first look at the 1992 penalty phase hearing. At the 1992 penalty phase hearing, the escape evidence was not coming in unless the door was open. The Commonwealth was extremely limited and restrained what it can present at that penalty phase hearing. The underlying facts of the murder, the aggravating circumstances. How do we know that? Their argument, the DA's argument, is that it could have come in to challenge the good character evidence that was put in favor of Ward. Your honor, I respectfully disagree. I think when you have a case like this and a prosecutor who is looking at four aggravating circumstances, the heinous facts in this case, the prosecutor is not gonna take the risk of trying to get it in in terms of refuting character. He's not gonna poke the bear if he doesn't need to. He had everything he needed in this case. He already had four aggravators. So the prosecutor was not gonna risk trying to interject it, create a possible issue for an appeal, create a possible mistrial by trying to get the escape in some other way. That escape was not coming in unless the door was open with positive prison adjustment evidence or to refute the E1, no significant history. How do we know that? What case supports your argument? That it wasn't- All I saw in your brief and the other side's brief were these statements, these ifs and dixits that they say it was coming in or it could have come in and you're saying it couldn't have come in. And I don't know who's right because nobody cited the authority to tell us. Well, I think the bottom line is, your honor, it really doesn't matter for where we are right now in terms of assessing this claim and what would have happened if the door was open to the positive prison adjustment evidence. In terms of why the Commonwealth did not raise the escape in the PCRA proceedings, the 1997 PCRA proceedings, the claim was raised in a 150 page amended petition. It was one of 23 claims. The records, the DOC records that were then attached weren't even part of the record until in response to the 907 notice of intent to dismiss. Then the case was dismissed without a hearing. There was no reason for the Commonwealth to even expand the record at that time. It was defendant's burden. In terms of why the escape wasn't raised pre-remand before the district court, the Commonwealth was working within the record that the defendant himself created. It was the defendant's burden. The Commonwealth's argument at that time was that the state court's decision was reasonable based on the record before the state court. The Commonwealth was not going beyond that record in making its arguments. There was no reason to discuss the escape then. The escape only became- The only reason for that to come in was after our remand order. Correct. The remand, when this court said, we need to look at this issue more closely. We need to look at the anti-mitigation evidence. That's when it was directly relevant to a claim of so-called positive prison adjustment evidence. Thank you. Your honors, have any other questions? Nope. Okay, thank you. For your time. Thank you, Ms. Muller. We'll hear the rebuttal of Mr. Lev. Thank you, your honors. Let me start with Mekas' statements about the handcuff key at the time of the city hall escape. Mr. Wharton had been charged, because there was no evidence in the record that he had a handcuff key at the time of the city hall escape. He was charged with that. It was said so in the complaint. That's the only evidence there is. Those charges of possession of the handcuff key were dropped at the time of his plea to escape. On the factual basis of the guilty plea that he entered into escape, there was no mention of the handcuff key. The factual basis says only, I've had the facts of this case read to me. We don't know what those facts were that were read, if it was just limited to the escape. So the story about the handcuff key being found by the elevator and being traced to Mr. Wharton, and Mr. Wharton undoing this handcuff key, is not in the record. So if that's the tie, then they didn't put that in the record, be well. In the end, I think, what this case comes down to is the reasonable probability of one juror standard, and what it means when evidence cuts both ways. Both the Supreme Court in Williams and Porter has recognized that mitigation often has both positive and negative aspects to it. And that when lawyers are supposed to look for records, they do so knowing that there may be positive and negative aspects to it. This court recognized that in Alton versus Kearney, and Abdul Salaam versus Secretary of DOC. Supreme Court has recognized it repeatedly. So mitigation cuts both ways. Are you saying that there's kind of a categorical rule here that when evidence cuts both ways, the one juror standard's satisfied? Not necessarily. It depends. It could depend on the weight of the evidence. We have to look at a little bit of how strong the evidence is that cuts both ways. Yes. So if, for example, Mr. Wharton had used this handcuff key to try to escape while he was in prison, and in doing so had assaulted or killed corrections officers doing that, that would be a very different story and entitled to very much greater weight than the fact that he possessed, but didn't use those pieces of antenna during a one-week period in the six and a half years of incarceration. So yes, there is weight, and it's gonna come down to the question of how much weight could a single juror, could a single juror in this case, have found that the positives outweigh the negatives? And there's credible expert testimony that a juror could have relied on. There's the records themselves of Mr. Wharton's change in behavior and his growth and maturation. As for the expert testimony, we look at that de novo, this court. I assume it's your position that Judge Goldberg's weighing of that expert testimony is not entitled to deference, is that right? That's right, because I think there's even Judge Goldberg recognized it's not, the question wasn't for him to decide which expert should be weighed more, right? The question wasn't for him to decide whether Mr. Wharton's behavior was positive or negative. The question was, is there a reasonable probability that a single juror could have accepted the defense expert over the amicus expert? Right, but doesn't the expert testimony inform that decision? It does, and Judge Goldberg's opinion is filled with recognition of the positive aspects of the defense expert. And in the end, what Judge Goldberg found was that he agreed, and I don't know if that's the right standard, his agreement, but he agreed with Dr. Beard's testimony that the positive behavior represented the minimum standards that prisons expect. But that's not entitled to deference for an inmate. Well, even if it is, I don't think it is entitled to deference, but even if it is. We have to make our own evaluation of that testimony and how much, if at all, it informs the one juror's standard. And look at what that means. If the minimum expectation of a prisoner's behavior is good behavior, good reports, no negative reports, no violence, some negative stuff, but mostly positive stuff within it, if that's the minimum expectation, that's pretty good. Right, that's a pretty decent standard of good behavior, the minimum expectation. If the minimum expectation is mostly positive behavior and continued growth of an inmate, then that's something a juror could rely on, to say, you know, even given the amicus experts, I can see that there's reasons to vote for life in light of the other evidence, the other mitigating, about Mr. Wharton's good qualities and his cooperation with the police at the time of his arrest, the things they found as mitigation. So you have to evaluate whether one, whether you weigh all the positive evidence against the significant negative evidence and see if it really does cut both ways or if it only cuts one way. If it only cuts positively, then I lose. If it cuts both ways in this case, then Mr. Wharton should be granted relief. All right, thank you, Mr. Webb. Thank you, Your Honor. Thank you, Your Honor. Can we take a five-minute break before we go? Absolutely, yes. Thank you for, and thank you to Mr. George and Ms. Mahler for the extensive briefing and very helpful argument. We'll take the matter under advisement, and we'll take a five-minute recess.